99 N.J. Super. 441 (1968)
240 A.2d 195
ZABRISKIE CHEVROLET, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
ALFRED J. SMITH, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided February 29, 1968.
*444 Miss Paulette M. Lemay for plaintiff (Messrs. Cole, Berman & Garth, attorneys).
Mr. Jerome A. Vogel for defendant (Messrs. Saltzman & Swartz, attorneys).
DOAN, J.D.C. (temporarily assigned).
This action arises out of the sale by plaintiff to defendant of a new 1966 Chevrolet automobile. Within a short distance after leaving the showroom the vehicle became almost completely inoperable by reason of mechanical failure. Defendant the same day notified plaintiff that he cancelled the sale and simultaneously stopped payment on the check he had tendered in payment of the balance of the purchase price. Plaintiff sues on the check and the purchase order for the balance of the purchase price plus incidental damages and defendant counterclaims *445 for the return of his deposit and incidental damages.
The facts are not complex nor do they present any serious dispute.
On February 2, 1967 defendant signed a form purchase order for a new 1966 Chevrolet Biscayne Sedan which was represented to him to be a brand-new car that would operate perfectly. On that occasion he paid plaintiff $124 by way of deposit. On February 9, 1967 defendant tendered plaintiff his check for $2,069.50 representing the balance of the purchase price ($2,064) and $5.50 for license and transfer fees. Delivery was made to defendant's wife during the early evening hours of Friday, February 10, 1967, at which time she was handed the keys and the factory package of printed material, including the manual and the manufacturer-dealer's warranty, none of which she or her husband ever read before or after the sale was made, nor were the details thereof specifically explained to or agreed to by defendant. While en route to her home, about 2 1/2 miles away, and after having gone about 7/10 of a mile from the showroom, the car stalled at a traffic light, stalled again within another 15 feet and again thereafter each time the vehicle was required to stop. When about halfway home the car could not be driven in "drive" gear at all, and defendant's wife was obliged to then propel the vehicle in "low-low" gear at a rate of about five to ten miles per hour, its then maximum speed. In great distress, defendant's wife was fearful of completing the journey to her home and called her husband, who thereupon drove the car in "low-low" gear about seven blocks to his home. Defendant, considerably upset by this turn of events, thereupon immediately called his bank (which was open this Friday evening), stopped payment on the check and called plaintiff to notify them that they had sold him a "lemon," that he had stopped payment on the check and that the sale was cancelled. The next day plaintiff sent a wrecker to defendant's home, brought the vehicle to its repair shop and after inspection determined that the transmission was defective.
*446 Plaintiff's expert testified that the car would not move, that there was no power in the transmission and in that condition the car could not move. Plaintiff replaced the transmission with another one removed from a vehicle then on plaintiff's showroom floor, notifying defendant thereafter of what had been done. Defendant refused to take delivery of the vehicle as repaired and reasserted his cancellation of the sale. Plaintiff has since kept the vehicle in storage at his place of business. Within a short period following these occurrences plaintiff and defendant began negotiations for a new 1967 Chevrolet, but these fell through when plaintiff insisted that a new deal could only be made by giving defendant credit for the previously ordered 1966 Chevrolet. This defendant refused to do because he considered the prior transaction as cancelled.
The issues in this case present problems for disposition under the Uniform Commercial Code (Code). The Code rejects the old court "lump concept" or "title" approach in favor of the "narrow issue" access to sales problems. It provides that the act shall be liberally construed and applied to promote its underlying purposes and policies. N.J.S. 12A:1-102. Further, that unless displaced by the particular provisions of the Code, the principles of law and equity or other validating or invalidating cause shall supplement its provisions, N.J.S. 12A:1-103; and further, that the remedies provided by the Code shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed. N.J.S. 12A:1-106.
Plaintiff-seller contends that all rights and remedies in this case are governed and limited by the sales contract. Paragraph 9 in fine print on the back of the order form states:
"9. There are no warranties, express or implied, on Chevrolet motor vehicles sold by Dealer except the New Vehicle Warranty which Dealer, as Seller, and not as agent of the Manufacturer, gives to Purchaser on each new Chevrolet motor vehicle sold by Dealer."
*447 The new vehicle warranty, which defendant-buyer did not receive at the time that he signed the order form, states that the promise to repair or replace defective parts is:
"* * * in lieu of any other warranties, expressed or implied, including any implied warranty of merchantability or fitness for a particular purpose, and of any other obligations or liability on the part of the Manufacturer, and Chevrolet Motor Division neither assumes nor authorizes any other person to assume for it any other liability in connection with such motor vehicle or chassis."
Assuming that this contract of adhesion is applicable, it is not enforceable in this case. The contract does not limit the remedies of the buyer (see N.J.S. 12A:2-719), but attempts to limit the warranty obligation.
The evidence is plain that the terms of these attempted disclaimers and limitations of warranties were not actually brought to defendant's attention nor explained to him in detail. It would be difficult to conceive that a buyer of a new automobile would agree to a sale which had conditions attached to the effect that the buyer would be compelled to accept the vehicle, even if it did not operate. Obviously, this was not defendant's intention and the proof is to the contrary.
The Code makes provision for exclusion or modification of warranties. N.J.S. 12A:2-316 (2) provides as follows:
"Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that `There are no warranties which extend beyond the description on the face hereof'."
The critical requirement is that the language be "conspicuous." The sales contract contained in the purchase order form did not effectively disclaim or exclude the implied warranties of merchantability or fitness. The attempted limitations *448 of these warranties were not "conspicuous" and hence failed in their purpose. Moreover, the "New Vehicle Warranty" which endeavored to limit these warranties was contained in the manual which was not received by defendant until the delivery of the car, long after the contract was signed.
In Diepeveen v. Larry Vogt, Inc., 27 N.J. Super. 254 (App. Div. 1953), the court said:
"After a contract to sell has been entered into or, at any event, where title has passed to the buyer, a disclaimer of warranties, such as this one, is ineffectual. * * *" (at p. 256)
Attempts at limitation and disclaimer of this type were severely criticized in Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 385-406 (1960), where the court said:
"* * * we are of the opinion that Chrysler's attempted disclaimer of an implied warranty of merchantability and of the obligations arising therefrom is so inimical to the public good as to compel an adjudication of its invalidity." (at p. 404)
Although Henningsen was decided prior to the effective date of the Code, its basic concept that a technique such as the one described herein is against public policy now finds statutory support not only in N.J.S. 12A:2-316(2) but also in N.J.S. 12A:2-302 (unconscionable contract or clause).
The concept that the vendor's obligation goes beyond the written instrument was appropriately expressed in Henningsen, supra. The court expressed itself in this language:
"Under modern conditions the ordinary layman, on responding to the importuning of colorful advertising, has neither the opportunity nor the capacity to inspect or to determine the fitness of an automobile for use; he must rely on the manufacturer who has control of its construction, and to some degree on the dealer who, to the limited extent called for by the manufacturer's instructions, inspects and services it before delivery. In such a marketing milieu his remedies and those of persons who properly claim through him should not depend `upon the intricacies of the law of sales. The obligation *449 of the manufacturer should not be based alone on privity of contract. It should rest, as was once said, upon "the demands of social justice".'" (at p. 384)
The court further said:
"In a society such as ours, where the automobile is a common and necessary adjunct of daily life, and where its use is so fraught with danger to the driver, passengers and the public, the manufacturer is under a special obligation in connection with the construction, promotion and sale of his cars. Consequently, the courts must examine purchase agreements closely to see if consumer and public interests are treated fairly." (at p. 387)
Dealing further with the contractual foundation between the parties the court stated:
"The traditional contract is the result of free bargaining of parties who are brought together by the play of the market, and who meet each other on a footing of approximate economic equality. In such a society there is no danger that freedom of contract will be a threat to the social order as a whole. But in present-day commercial life the standardized mass contract has appeared. It is used primarily by enterprises with strong bargaining power and position. `The weaker party, in need of the goods or services, is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses. His contractual intention is but a subjection more or less voluntary to terms dictated by the stronger party, terms whose consequences are often understood in a vague way, if at all.' Kessler, `Contracts of Adhesion  Some Thoughts About Freedom of Contract,' 43 Colum. L. Rev. 629, 632 (1943); Ehrenzweig, `Adhesion Contracts in the Conflict of Laws,' 53 Colum. L. Rev. 1072, 1075, 1089 (1953)." (at p. 389)
In dealing with the remedy for a buyer who has gotten less than what he contracted for, the court in Henningsen, supra, at page 395, quoted from the language in Myers v. Land, 314 Ky. 514, 235 S.W.2d 988 (1950), where the Kentucky court expressed itself in this fashion:
"* * * Anyone brought up to believe that for every wrong there is a remedy will pause before saying that the seller will escape all liability by merely putting in an order blank a statement to the *450 effect that there is no assurance that the buyer will get a machine that will work. We have paused for the moment and have readily concluded that the avoidance of liability under such a circumstance is not permitted by the law * * *."
Accordingly, we hold that the vehicle delivered to defendant was substantially defective and constituted a breach of the contract and the implied warranty of merchantability, and unless otherwise legally bound defendant justifiably abrogated the sale.
Our attention is next directed to the claim that there was a breach of the contract by plaintiff in that there was a failure of consideration thereunder. In Moreira Construction Co., Inc. v. Moretrench Corp., 97 N.J. Super. 391 the court pointed up this important distinction:
"Plaintiff also relies on Myers v. Land, 314 Ky. 514, 235 S.W.2d 988 (Sup. Ct. 1951), a case cited in Henningsen. In that case plaintiff purchased from defendant a machine to manufacture concrete blocks. The contract of sale expressly disclaimed any warranties not contained therein and limited defendant's liability to the replacement of defective parts. When the machine failed to manufacture concrete blocks plaintiff instituted an action for the purchase price. The court held that the limitation of liability and disclaimer of warranties did not bar the suit. But the theory upon which the court based its holding is important. It held that the failure of the machine to accomplish the purpose for which it was designed amounted to more than a breach of warranty. Rather, `there has been no delivery of that which was bought.' (Emphasis added). 235 S.W.2d, at p. 991." (at p. 395)
Cf. Farrell v. Brandtjen & Kluge, Inc., 176 Pa. Super. 412, 107 A.2d 695 (Super. Ct. 1954).
Plaintiff urges that defendant accepted the vehicle and therefore under the Code N.J.S.A. 12A:2-607 (1) is bound to complete payment for it. Defendant asserts that he never accepted the vehicle and therefore under the Code properly rejected it; further, that even if there had been acceptance he was justified under the Code in revoking the same. Defendant supports this claim by urging that what was delivered to him was not what he bargained for, i.e., a *451 new car with factory new parts, which would operate perfectly as represented and, therefore, the Code remedies of rejection and revocation of acceptance were available to him. These remedies have their basis in breach of contract and failure of consideration although they are also viewed as arising out of breach of warranty. The essential ingredient which determines which of these two remedies is brought into play is a determination, in limine, whether there had been an "acceptance" of the goods by the buyer. Thus the primary inquiry is whether the defendant had "accepted" the automobile prior to the return thereof to the plaintiff.
N.J.S. 12A:2-606 states in pertinent part:
(1) Acceptance of goods occurs when the buyer
(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
(b) fails to make an effective rejection (subsection (1) of 12A:2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them, or
(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him."
The New Jersey Study Comment to 12A:2-606 states:
"2. Subsection 2-606 (1) (a) is similar to the first clause of section 48 of the U.S.A. (N.J.S.A. 46:30-54). See also, Paul Gerli & Co. v. Mistletoe Silk Mills, 80 N.J.L. 128, 76 A. 335 (1910)."
The Gerli case states at p. 129:
"The question arises whether the defendant accepted it. The defendant had a right to inspect and examine (Sales Act, § 47), and, if necessary, to test the goods even though the test involved destruction of a part. Williston on Sales, § 475. If, however, the defendant intimated to the plaintiff that it had accepted the goods, or if the defendant did any act inconsistent with the ownership of the plaintiff, or if, after the lapse of a reasonable time, it retained the goods without intimating to the plaintiff a rejection, then the defendant must be deemed to have accepted the goods and the right of rescission is gone. Sales Act, § 48." (at p. 129)
*452 The New Jersey Study Comment to 12A:2-606 further states:
"3. Subsection 2-606 (1) (b) is in accord with Sections 47 and 48 of the U.S.A., N.J.S.A. 46:30-53 and 54, and the case law of the state. S.G. Young, Inc. v. B. & C. Distributors Co., 23 N.J. Super. 15, 92 A.2d 519 (1952); Woodward v. Emmons, 61 N.J.L. 281, 39 A. 703 (1898)."
Young states:
"If plaintiff had found the resistors defective or imperfect it had the right to reject them and demand replacement or refund, or it could confirm the agreement of purchase, waiving its rights and treating the goods as its own. It could not do both. Had it desired to reject the goods purchased for cause, it should have acted promptly and within a reasonable time after discovering that the resistors were defective or imperfect." (at p. 27)
And Woodward held:
"Where the vendees of machines intended or adapted for pulverizing stone and hard materials, and purchased under a warranty of fitness for such purpose, after testing them, and, discovering defects which cause dissatisfaction, continue to use them, not in order to make further tests, but merely for the purpose of their own convenience or profit, such use constitutes an acceptance, and concludes them from the defense of a total failure of consideration, and they must rely upon their warranty."
It is clear that a buyer does not accept goods until he has had a "reasonable opportunity to inspect." Defendant sought to purchase a new car. He assumed what every new car buyer has a right to assume and, indeed, has been led to assume by the high powered advertising techniques of the auto industry  that his new car, with the exception of very minor adjustments, would be mechanically new and factory-furnished, operate perfectly, and be free of substantial defects. The vehicle delivered to defendant did not measure up to these representations. Plaintiff contends that defendant had "reasonable opportunity to inspect" by the privilege to take the car for a typical "spin around the block" before signing the purchase order. If by this contention plaintiff *453 equates a spin around the block with "reasonable opportunity to inspect", the contention is illusory and unrealistic. To the layman, the complicated mechanisms of today's automobiles are a complete mystery. To have the automobile inspected by someone with sufficient expertise to disassemble the vehicle in order to discover latent defects before the contract is signed, is assuredly impossible and highly impractical. Cf. Massari v. Accurate Bushing Co., 8 N.J. 299, 313. Consequently, the first few miles of driving become even more significant to the excited new car buyer. This is the buyer's first reasonable opportunity to enjoy his new vehicle to see if it conforms to what it was represented to be and whether he is getting what he bargained for. How long the buyer may drive the new car under the guise of inspection of new goods is not an issue in the present case. It is clear that defendant discovered the nonconformity within 7/10 of a mile and minutes after leaving plaintiff's showroom. Certainly this was well within the ambit of "reasonable opportunity to inspect." That the vehicle was grievously defective when it left plaintiff's possession is a compelling conclusion, as is the conclusion that in a legal sense defendant never accepted the vehicle.
Nor could the dealer under such circumstances require acceptance. Cf. Code Comment 2 (subsection 2) to N.J.S. 12A:2-106:6.
"It is in general intended to continue the policy of requiring exact performance by the seller of his obligations as a condition to his right to require acceptance. * * *"
Even if defendant had accepted the automobile tendered, he had a right to revoke under N.J.S. 12A:2-608:
"(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it.
(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

*454 (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them. L. 1961, c. 120, sec. 2-608."
The New Jersey Study Comment to 12A:2-608 reads:
"3. Subsection 2-608 (1) permits revocation of acceptance only where there has been a non-conformity which substantially impairs the value of the lot or commercial unit which was accepted. No similar restriction is placed on the buyer's rights to rescind under section 69 of the U.S.A. (N.J.S. 46:30-75). Under the U.S.A., however, the courts have not allowed rescission for a trivial breach of warranty. Therefore, the U.C.C. requirement of substantial impairment does not differ radically from the decisions under the U.S.A. See, in this connection, Miller & Sons Bakery Co. v. Selikowitz, 4 N.J. Super. 97, 66 A.2d 441 (1949) (`The right to rescind, however, is an extreme one and does not arise from every breach. * * * The general rule is that rescission will not be permitted for a slight or casual breach of contract, but only for such breaches as are so substantial * * * as to defeat the objective of the parties * * *')." 12 C.J. Sec. 661, p. 613; 17 C.J.S. Contracts § 435, p. 918.
Nor did plaintiff have reasonable grounds to believe that a new automobile which could not even be driven a bare few miles to the buyer's residence would be acceptable. The dealer is in an entirely different position from the layman. The dealer with his staff of expert mechanics and modern equipment knows or should know of substantial defects in the new automobile which it sells. There was offered into evidence the dealer's inspection and adjustment schedule containing over 70 alleged items that plaintiff caused to be inspected, including the transmission. According to that schedule the automobile in question had been checked by the seller for the satisfaction of the buyer, and such inspection *455 included a road test. The fact that the automobile underwent a tortured operation for about 2 1/2 miles from the showroom to defendant's residence demonstrates the inherent serious deficiencies in this vehicle which were present when the so-called inspection was made by plaintiff, and hence plaintiff was aware (or should have been) that the vehicle did not conform to the bargain the parties had made, and plaintiff had no reasonable right to expect that the vehicle in that condition would be accepted.
There having been no acceptance, the next issue presented is whether defendant properly rejected under the Code. That he cancelled the sale and rejected the vehicle almost concomitantly with the discovery of the failure of his bargain is clear from the evidence. N.J.S. 12A:2-601 deliniates the buyer's rights following nonconforming delivery and reads as follows:
"Subject to the provisions of this Chapter on breach installment contracts (12A:2-612) and unless otherwise agreed under the sections on contractual limitations of remedy (12A:2-712 and 2-719), if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may
(a) reject the whole; * * *" (Italics added)
Section 12A:2-602 indicates that one can reject after taking possession. Possession, therefore, does not mean acceptance and the corresponding loss of the right of rejection; nor does the fact that buyer has a security interest along with possession eliminate the right to reject.
"(1) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.
(2) Subject to the provisions of the two following sections on rejected goods (12A:2-603 and 2-604).
(a) after rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller; and
(b) if the buyer has before rejection taken physical possession of goods in which he does not have a security interest under the provisions of this Chapter (subsection (3) of 12A:2-711), he is *456 under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them; but
(c) the buyer has no further obligations with regard to goods rightfully rejected." (Italics added)
N.J.S. 12A:2-106 defines conforming goods as follows:
"(2) Goods or conduct including any part of a performance are "conforming" or conform to the contract when they are in accordance with the obligations under the contract."
The Uniform Commercial Code Comment to that section states:
"2. Subsection (2): It is in general intended to continue the policy of requiring exact performance by the seller of his obligations as a condition to his right to require acceptance. However, the seller is in part safeguarded against surprise as a result of sudden technicality on the buyer's part by the provisions of Section 2-508 on seller's cure of improper tender or delivery. Moreover usage of trade frequently permits commercial leeways in performance and the language of the agreement itself must be read in the light of such custom or usage and also, prior course of dealing, and in a long term contract, the course of performance."
There was no evidence at the trial concerning any "custom or usage", although plaintiff in its brief argued that it is the usage of the automobile trade that a buyer accept a new automobile, although containing defects of manufacture, if such defects can be and are seasonably cured by the seller. Perhaps this represents prevailing views in the automobile industry which have, over the years, served to blanket injustices and inequities committed upon buyers who demurred in the light of the unequal positions of strength between the parties. The spirit of the Henningsen opinion, supra, contemplated these conditions which cried out for correction. In the present case we are not dealing with a situation such as was present in Adams v. Tremontin, 42 N.J. Super. 313 (App. Div. 1956). In that case, brought for breach of implied warranty of merchantability, the court held that minor *457 defects, such as adjustment of the motor, tightening of loose elements, fixing of locks and dome light, and a correction of rumbling noise, were not remarkable defects, and therefore there was no breach. Here the breach was substantial. The new car was practically inoperable and endowed with a defective transmission. This was a "remarkable defect" and justified rejection by the buyer.
Lastly, plaintiff urges that under the Code, N.J.S. 12A:2-508, it had a right to cure the nonconforming delivery. N.J.S. 12A:2-508 states:
"(1) Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.
(2) Where the buyer rejects a non-conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender." (Italics added)
The New Jersey Study Comment to 12A:2-508 reads:
"3. Subsection 2-508 (2) has been applauded as a rule aimed at ending `forced breaches.' See, Hawkland, Sales and Bulk Sales Under the Uniform Commercial Code, 120-122 (1958). * * *
Section 2-508 prevents the buyer from forcing the seller to breach by making a surprise rejection of the goods because of some minor nonconformity at a time at which the seller cannot cure the deficiency within the time for performance."
The Uniform Commercial Code Comment to 12A:2-508 reads:
2. Subsection (2) seeks to avoid injustice to the seller by reason of a surprise rejection by the buyer. However, the seller is not protected unless he had `reasonable grounds to believe' that the tender would be acceptable."
It is clear that in the instant case there was no "forced breach" on the part of the buyer, for he almost immediately *458 began to negotiate for another automobile. The inquiry is as to what is intended by "cure", as used in the Code. This statute makes no attempt to define or specify what a "cure" shall consist of. It would appear, then, that each case must be controlled by its own facts. The "cure" intended under the cited section of the Code does not, in the court's opinion, contemplate the tender of a new vehicle with a substituted transmission, not from the factory and of unknown lineage from another vehicle in plaintiff's possession. It was not the intention of the Legislature that the right to "cure" is a limitless one to be controlled only by the will of the seller. A "cure" which endeavors by substitution to tender a chattel not within the agreement or contemplation of the parties is invalid.
For a majority of people the purchase of a new car is a major investment, rationalized by the peace of mind that flows from its dependability and safety. Once their faith is shaken, the vehicle loses not only its real value in their eyes, but becomes an instrument whose integrity is substantially impaired and whose operation is fraught with apprehension. The attempted cure in the present case was ineffective.
Accordingly, and pursuant to N.J.S. 12A:2-711(1), judgment is rendered on the main case in favor of defendant. On the counterclaim judgment is rendered in favor of defendant and against plaintiff in the sum of $124, being the amount of the deposit, there being no further proof of damages.
Defendant shall, as part of this judgment, execute for plaintiff, on demand, such documents as are necessary to again vest title to the vehicle in plaintiff.