SINCO, INC., Plaintiff/Counterclaim–
Defendant,

v.

METRO–NORTH COMMUTER RAIL-
ROAD COMPANY, Defendant/Coun-
terclaim–Plaintiff.

No. 99 CIV 10631 (AKH).

United States District Court,
S.D. New York.

March 1, 2001.

Arthur, Chapman, Kettering, Smetak & Pikala, P.A., By Lindsay G. Arthur, Jr., for Plaintiff/Counterclaim–Plaintiff Sinco, Inc.

Sedgwick, Detert, Moran & Arnold, By Gary J. Levy, for Plaintiff/Counterclaim–Plaintiff Sinco, Inc.

Richard K. Bernard, By Richard L. Gans, Sofia C. Hubscher, for Defendant/Counterclaim–Plaintiff Metro–North Commuter Railroad Company.

### MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

HELLERSTEIN, District Judge.

In this action for breach of contract, the parties filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Oral argument was heard on December 14, 2000. For the reasons stated below, I grant the motion for summary judgment filed by Defendant Metro–North Commuter Railroad Company ("Metro–North") and deny the motion for summary judgment filed by Plaintiff Sinco, Inc. ("Sinco"). I refer the case to Magistrate Judge Frank Maas for an inquest as to damages.

## I. *Factual Background*

In early 1998, Metro–North determined that federal and state laws required the installation of a fall-protection system for certain elevated walkways, roof areas, and interior catwalks in Grand Central Terminal before maintenance and renovation work could proceed in those areas. The system was necessary to ensure the safety of Metro–North employees during work performed at great heights on the interior and exterior of the Terminal. In order to conclude its extensive renovations of the Terminal and permit necessary ongoing maintenance work, the system had to be installed promptly.

Metro–North reviewed various bids, including Sinco's proposal for a system called "Sayfglida." This system involves a harness worn by the worker, a network of cables, and metal clips or sleeves called "Sayflinks" that connect the worker's harness to the cables. Metro–North awarded the contract to Sinco, agreeing to pay $197,325.00 for the construction and installation of the system by June 26, 1999.

The contract provided that Sinco deliver a reliable fall-protection system, a "fall protection system [that] will provide a safer work environment for maintenance personnel in various areas within GCT." *See* Contract at 146. The reliability of such a system was crucial; any failure of the fall protection equipment easily could result in injury or loss of life. The contract language reflected this emphasis on reliability. Article 14.01 provided:

> Contractor shall ensure that all goods, components, parts, equipment, accessories and material that shall be furnished have been tested, found compatible with each other and meet all applicable Federal, State and Local guidelines.

The "Contractor Quality Control Program Requirements" provided:

> Metro–North requires that Work under this Contract must be performed in conformance with a Quality Control (QC) Plan which complies with the Quality Control requirements in the Technical Provisions.

Article 1.02(9) of the contract terms defined the "contract" broadly, encompassing Sinco's proposal document as well as various other supporting documents. Sinco's proposal repeatedly stressed the reliability of the system; for example, Section 8(d) of the proposal stated that the system "will provide 100% Fall Protection for the users."

The contract also gave the contractor an opportunity to cure any alleged breach, following a notice of default by Metro–North. Article 7.02 of the contract provided:

> If an Event of Default occurs, Metro–North may so notify the Contractor ("Default Notice"), specifying the basis(es) for such default, and advising the Contractor that, unless such default is rectified to the satisfaction of Metro–North within seven (7) days from such Default Notice, the Contractor shall be in default; except that, at its sole discretion, Metro–North may extend such seven (7) day period for such additional period as Metro–North shall deem appropriate without waiver of any of its

rights hereunder. The Default Notice shall specify the date the Contractor is to discontinue all Work (the "Termination Date"), and thereupon, unless rescinded by Metro–North, the Contractor shall discontinue the Work upon the Termination Date.

After the award of the contract, Sinco performed installation work at Grand Central. On June 29, 1999, Sinco began a training session for Metro–North employees. During the session, a Metro–North employee was examining a Sayflink sleeve when the sleeve fell apart in his hands. The three other sample Sayflinks delivered by Sinco were found to have identical defects, and the training immediately was suspended. On June 30, 1999, Metro–North's representative wrote to Sinco, "Metro–North herewith puts Sinco, Inc. on notice, that the entire 'Fall Protection System' as currently installed by Sinco, Inc. at Grand Central Terminal pursuant to the subject contract is unacceptable."

Sinco's representatives, after a brief internal investigation, admitted that their quality control processes had failed. Specifically, they determined that there had been a failure of the metal "staking" that helped maintain the structural integrity of the Sayflink sleeve. In a June 30, 1999 letter, Sinco's representatives attributed the defective staking to the fact that the operator constructing the parts "was performing operations which he had not done recently," resulting in the metal staking being "off center." [1]

Within two days, Sinco manufactured and delivered two types of replacement

clips: four replacement clips were staked by machine; and four had additional metal welded across the end of the stake as reinforcement. Sinco also included a videotape of a stress test performed on a welded Sayflink. Metro–North timely rejected the proposed cure.

At meetings and in telephone discussions following the June 29, 1999 incident, Sinco also suggested other potential cures. Sinco offered to pay for an independent engineering firm to examine the fall protection system to determine its reliability.[2] Sinco also offered to perform "drop tests" at Grand Central Terminal for observers, to pay for Metro–North employees to travel to Minnesota to inspect its manufacturing plant and undergo training on the equipment in question, to conduct on-site training and demonstrations at Metro–North offices, and to substitute sleeves manufactured by a different company in place of the Sayfglida sleeves. Metro–North did not accept any of these ideas.

On August 11, 1999, Metro–North sent a Notice of Default to Sinco, stating that the contract would be terminated on August 19, 1999, following the seven-day cure period provided in the contract. On September 16, 1999, following additional meetings and communications with Sinco, Metro–North terminated the contract. Following Sinco's termination, Metro–North awarded the work to another company, Surety, Inc., at a contract price of $347,896.99. The price of the Surety, Inc. contract, therefore, was $126,360.99 more than the Sinco contract price of $197,325.00.

---

**1.** At some later date not made clear in the record, Sinco reached a more precise conclusion about what went wrong. In its motion papers and at argument, Sinco stated that the defect was created when an employee inserted the stakes manually, using a hammer instead of the machine specifically designed for staking of Sayflinks. There is no indication that Sinco disclosed this to Metro–North during the cure period.

**2.** The record suggests that the idea of an independent engineering review originated

with Sal Monti, Superintendent of Building Construction for Metro–North, during a meeting by the parties. Sinco subsequently included the idea among several potential cures that it suggested during meetings and correspondence with Metro–North. As discussed below, the burden of effecting a cure rested squarely on Sinco. The fact that the idea originated with a Metro–North employee is not material to the determination of whether Sinco cured its breach.

On October 19, 1999, Sinco filed its complaint in this action, alleging breach of contract. Metro–North counterclaimed for its alleged cost of cover, the difference between the Sinco contract price and the Surety, Inc. contract price.

## II. *Issues Presented*

The parties have filed cross-motions for summary judgment, which raise three central issues. First, was Sinco's breach so egregious as to be total, without potential for cure? Second, by delivering replacement parts and an accompanying videotape of stress testing, did Sinco cure its breach? Third, did any of Sinco's subsequent proposals constitute a cure of the breach?

■ Article 10.14 of the contract provides: "This Contract is to be construed and enforced pursuant to the laws of the State of New York." As the contract was for a transaction in goods, the substantive law of Article 2 of the New York Uniform Commercial Code governs this dispute. *See* N.Y.U.C.C. § 2–102. Summary judgment may be granted if the pleadings and written discovery, together with the affidavits,[3] show that there is no issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). I find no issue of material fact precluding judgment as a matter of law for Metro–North.

## III. *Sinco's Breach Did Not Render Cure Futile*

Metro–North alleges that Sinco's delivery of the defective Sayflinks was so material a breach that Metro–North was entitled to terminate the contract without even providing an opportunity for cure. This argument conflicts with both the language of the contract and the substantive law of New York.

■ Article 7.01 of the contract provides that a "material breach" by Sinco may be considered an "Event of Default." "The remedy of termination—or, more accurately, the 'right' to terminate—is available only where one party has materially breached the contract.... Where a breach is material, the party is justified in refusing to go on, and thus the law provides that party with the right to terminate." *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F.Supp.2d 383, 392 (S.D.N.Y. 1999). It is well-settled under New York law that in order to justify termination, "a breach must be ... so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.' "[4] *Babylon Assocs. v. County of Suffolk*, 101 A.D.2d 207, 475 N.Y.S.2d 869, 874 (App. Div.2d Dep't 1984) (quoting *Callanan v. Keeseville, A.C. & L.C.R.*, 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910)). Termination is an "extraordinary remedy" to be permitted only when the breach goes to "the root of the agreement." *Septem-*

3. As part of its supplemental submissions, Sinco filed an Affidavit of Jim Beardsley, attaching three exhibits. The exhibits purport to be Mr. Beardsley's handwritten notes of meetings between the parties on August 17, 1999 and September 10, 1999. Sinco has conceded that these notes were not produced previously, even though duly encompassed by proper discovery requests. Because these notes were not produced at the appropriate stage of this case, during discovery, I will not permit them to become part of the record at this late date, and I have not considered them in deciding the motions before me. Although the non-disclosure of these notes impaired Metro–North's ability to conduct relevant discovery and to develop a full scale of questioning for the deposition of Mr. Beardsley, I decline to impose sanctions or other relief in light of my disposition of Metro–North's motion for summary judgment.

4. Several cases conflate the terms "rescission" and "termination," which refer to conceptually distinct doctrines.

*bertide Publishing, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir.1989).

■ An injured party's right of termination, however, is limited by the doctrine of cure.

> Although a material breach justifies the injured party in exercising a right to self-help by suspending performance, it does not necessarily justify the injured party in exercising such a right by terminating the contract. Fairness ordinarily dictates that the party in breach be allowed a period of time—even if only a short one—to cure the breach if it can. If the party in breach does cure within that period, the injured party is not justified in further suspension of its performance and both parties are still bound to complete their performances.

E. Allan Farnsworth, *Farnsworth on Contracts*, § 8.18 (2d ed.1998). Here, in fact, Article 7.02 of the contract specifically provides Sinco with an opportunity to cure in the event of a material breach. Sinco's breach, although material, justifying Metro–North's exercise of its contractual and common-law right to declare Sinco in default and suspend performance, did not eliminate Sinco's right, under Article 7.02 and under New York common law, to cure its breach.

Nevertheless, Metro–North argues that the delivery of defective Sayflinks was so severe a breach that it irremediably undermined Metro–North's confidence in the fall-protection system, rendering futile any attempt at cure. Following the discovery of the defect, Metro–North's unions reported that their members would not use the system, and the unions repeatedly expressed a complete lack of confidence in Sinco and its products. Metro–North contends that nothing Sinco did—no curative performance of any sort—could restore this lost confidence. In other words, the breach could not be cured.

In support of this "shaken faith" or "loss of confidence" theory, Metro–North cites case law from states other than New York.

I find these authorities not entirely applicable to the case before me.

*Zabriskie Chevrolet, Inc. v. Smith*, 99 N.J.Super. 441, 240 A.2d 195 (N.J.Sup.Ct. 1968) involved a car dealer's efforts to cure its delivery of new car with a faulty transmission by replacing the transmission with one removed from a showroom model. The court found that the substitution of a transmission "not from the factory and of unknown lineage" was "not within the agreement or contemplation of the parties." *Id.* at 458, 240 A.2d 195. In short, the cure did not conform to the terms of the contract. The court's discussion of "shaken faith" is not essential to its conclusion; it appears from the text of the opinion that the attempted cure was objectively unreasonable.

*Hemmert Agricultural Aviation, Inc. v. Mid–Continent Aircraft Corp.*, 663 F.Supp. 1546 (D.Kan.1987), decided under Kansas state law, better illustrates Metro–North's theory. The flaws in a "cropduster" airplane purchased by the plaintiff created "fear and apprehension" in the pilot. The court held that, "[w]here the buyer's confidence in the dependability of the machine is shaken because of the defects and possible because of seller's ineffective attempts to cure, revocation appears justified." *Id.* at 1552.

There appear to be no New York cases treating the "shaken faith" theory articulated in *Hemmert* under Kansas law. I am not prepared to hold that Sinco's breach rendered futile any potential cure. A materially breaching party generally is entitled, subject to the relevant terms and conditions of the contract and the Uniform Commercial Code, to cure its breach within a reasonable period of time. Cure, in this case, required not only the timely delivery of conforming replacement parts, but a convincing showing of the reliability of the equipment. Such a showing would have required a description of Sinco's manufacturing methods and a precise explanation of the reasons why the demonstration parts failed in relation to such methods.

If Sinco had timely tendered such a cure, Metro–North would have been able to assess the reasons for the failure and the reliability of the cure. If, objectively, the cure was shown to be reliably safe, Metro–North would have been obligated to accept the cure, despite, perhaps, any lingering subjective misgivings of its employees. Ultimately, however, Sinco failed to cure and Metro–North justifiably terminated the contract.

## IV. Sinco's Delivery of Replacement Parts Failed to Cure its Breach

Section 2–508(2) of the New York Uniform Commercial Code provides a seller with an opportunity to cure a non-conforming delivery by prompt tender of a conforming product:

> Where the buyer rejects a non-conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.

Therefore, any cure made by Sinco would have to meet all its contractual requirements, *including the conditions regarding reliability.*

It is undisputed that Sinco's attempted performance under the contract—its delivery of a fall-protection system that included the defective Sayflinks—did not satisfy its contractual obligations. Pursuant to the Code and the contract, Sinco had the opportunity following this breach to cure.

■ Sinco, as the party attempting to effect a cure, had the burden to show that its proffered cure did, in fact, conform to the terms of the contract. Those terms included stringent conditions regarding quality control and reliability. It is uncontested that the welded Sayflinks, manufactured and delivered within two days after the equipment failure, were not subjected to Sinco's internal quality controls. The contractual conditions regarding reliability also applied to the replacement Sayflinks

that came from the regular assembly line that did not include the additional welding. Sinco had to show exactly what had caused the defect in the demonstration parts, that the underlying problem had been remedied, and that the defect would not recur. Furthermore, in order to conform to the contract, any replacement system had to be demonstrably reliable. In a situation such as this, involving the failure of vital safety equipment in front of the very individuals the equipment was designed to protect, the injured party did not have to accept at face value the word of the breaching party regarding the reliability of replacement equipment. Metro–North was entitled to objective evidence of such reliability.

■ Sinco did not satisfy that obligation by delivering to Metro–North a videotape of a welded and staked Sayflink surviving a single "pull test" of over 6200 pounds of stress. The replacement parts sent by Sinco included four Sayflinks that had been staked, and four that had been both welded and staked. The videotaped test was performed only on a Sayflink with the supplemental welding, not on a "standard" Sayflink that lacked the welding. Moreover, the test involved the application of stress in a different direction than the direction in which the failure occurred, and did not show reliability over time and frequent use. Finally, the videotape was produced by Sinco itself, not by a disinterested and objective third party. The videotaped stress test did not demonstrate the reliability of Sinco's attempted cure.

## V. None of Sinco's Subsequent Suggestions Constituted a "Cure"

■ When Metro–North did not accept Sinco's first attempted cure, Sinco proposed several ideas for other possible cures during discussions with Metro–North. However, these mere offers of potentially curative performance did not adequately cure Sinco's breach.

Pursuant to Section 2–508(2) of the New York Uniform Commercial Code, Sinco

had to notify Metro–North of its intention to cure and had to make a "conforming tender." "This clearly entails *more than a mere offer,* but less than actual physical delivery." *Allied Semi–Conductors Int'l, Ltd. v. Pulsar Components Int'l, Inc.,* 907 F.Supp. 618, 624 (E.D.N.Y.1995) (emphasis added). The parties in *Allied Semi–Conductors* were wholesale suppliers of computer components, and the case involved the sale of defective computer chips by the defendant, Pulsar Components, to the plaintiff, Allied Semi–Conductors. At a bench trial before a magistrate judge, Pulsar sought to prove that it had made "an offer to cure" the shipment of defective chips. In deciding in favor of Allied, the magistrate judge held that even if Pulsar proved that it made such an offer, the offer was "not sufficient to constitute a cure." *Id.* at 625. The magistrate judge concluded, "Pulsar never communicated an unconditional intention to cure and never made or even tendered a conforming delivery." *Id.* Pulsar appealed to the district court.

In affirming the magistrate judge's decision, the district court closely reviewed the meaning of "conforming tender" under N.Y.U.C.C. § 2–508. The court held that, although tender does not require the seller to make "actual, physical delivery," "[t]ender of delivery under the Code requires the seller to put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." *Id.* at 624 (*citing H. Sand & Co., Inc. v. Airtemp Corp.,* 934 F.2d 450, 454 (2d Cir. 1991)). *See also* N.Y.U.C.C. § 2–503(1). The court distinguished cases such as *T.W. Oil, Inc. v. Consolidated Edison Co. of New York, Inc.,* 57 N.Y.2d 574, 457 N.Y.S.2d 458, 443 N.E.2d 932 (1982), cited by Sinco in the instant case. The court found that the seller seeking to cure in *T.W. Oil* "had a present ability to effect delivery"; here, Sinco did not have such ability, having failed to put conforming goods and evidence of their reliability at Metro–North's disposition. In sum, the court in *Allied Semi–Conductors* rejected the argument made by Pulsar, and similarly made by Sinco in this case, "namely, that an offer to make conforming goods available, without more, preserves the seller's rights under U.C.C. § 2–508." *Allied Semi–Conductors,* 907 F.Supp. at 625.

Sinco's bare offers of potentially curative performance were not enough. The contract called for reliable equipment to protect Metro–North's employees from grave injury or death, and Sinco's equipment had been shown to be unreliable. In order to effectuate a cure, Sinco was obliged to make a conforming tender—that is, to put a fall protection system and proof of its reliability at Metro–North's disposition, leaving it to Metro–North to accept the tender. In essence, Sinco had to take the initiative; it could not shift any part of its burden to Metro–North. It was not enough for Sinco merely to suggest possible solutions. Because Sinco failed to cure its breach, I deny its motion for summary judgment and grant Metro–North's motion for summary judgment on the issue of liability.

## VI. *Damages*

Article 7.03 of the contract describes Metro–North's entitlement to damages and other relief in the event of a default by a contractor, such as Sinco:

A. Upon Contractor's default, Metro–North shall have the right to either complete the Work with its own forces and/or other Contractors or to require the Contractor's Surety to complete the Work under the Performance Bond hereunder. Metro–North, in connection with its right to complete the Work, may take possession of and use any or all of the materials, plant, tools, equipment, supplies and property of every kind provided by the Contractor, and/or procure other materials, plant, tools, equipment, supplies and property for the completion of same, and to charge the expense of said labor, materials, plant, tools, equip-

ment, supplies and property to the Contractor.

B. If a Default occurs, Contractor shall be liable for all damages resulting from the Default, including the difference between the total Contract price and the amount actually expended by Metro–North to complete the Work, as well as liquidated damages for delay in the completion of the Work beyond the Substantial Completion Date. The Contractor shall also remain liable for any other liabilities and claims related to the Contract. All damages may be deducted and paid out of such monies due the Contractor.

The undisputed facts show that, following the termination of the Sinco contract, Metro–North accepted the proposal of Surety, Inc. to install a fall protection system at a contract price of $347,896.99, reflecting increased labor and materials expenses compared to Sinco's proposal and the added expense of removing Sinco's system from Grand Central Terminal. Metro–North also took a "credit," the details of which are unclear, that allegedly reduced the Surety contract price to $323,685.99. Since the Sinco contract price was $197,325.00, the apparent cost of Metro–North's cover was the difference between the Sinco contract price and the revised Surety contract price, or $126,360.99.

However, the parties have provided virtually no briefing on the issue of damages. Therefore, in order to allow the parties to submit any additional relevant information with regard to the issue of damages, I refer this matter to Magistrate Judge Frank Maas for an inquest as to damages.

## VII. *Conclusion*

For the reasons stated, I grant Metro–North's motion for summary judgment and deny Sinco's motion for summary judgment as to the issue of liability. Entry of judgment shall await the results of the

inquest before Magistrate Judge Frank Maas.

SO ORDERED.