FORD MOTOR COMPANY *v.* Minerva GORNATTI

5-6017                                        486 S.W. 2d 10

Opinion delivered October 16, 1972
[Rehearing denied November 20, 1972.]

*Thomas E. Sparks* and *Wright, Lindsey & Jennings,* for appellant.

*Cockrill, Laser, McGehee, Sharp & Boswell,* for appellee.

Carleton Harris, Chief Justice. Appellee, Minerva Gornatti, and her husband purchased a 1966 Mercury Sedan from J. H. Everett, d/b/a Everett Motor Company in Fordyce on July 14, 1966. On December 4, 1967, Mrs. Gornatti, according to her testimony, was attempting to angle park her car when it suddenly accelerated, jumped

238

the curb, and crashed into Ross' Drug Store in Fordyce. Mrs. Gornatti received personal injuries, one person inside the store was killed, and two others injured as a result of the mishap. Appellee instituted suit against Ford Motor Company and its sales and repair agency in Fordyce, Everett Motor Company, alleging breach of warranty against Ford because of manufacturing and selling the car with a defective carburetor, and alleging negligence against Everett in failing to repair the car before the accident. On trial, at the conclusion of appellee's evidence, appellant moved for a directed verdict, and at the conclusion of all the evidence, this motion was again made, and overruled each time by the court. The jury returned a verdict finding that Everett Motor Company was not guilty of negligence, but finding that the automobile as sold and delivered to the Gornattis in 1966 had a defective carburetor which was a proximate cause of the accident. Mrs. Gornatti was found free of negligence and the jury returned a "nine man" verdict of $10,000 for personal injuries and $2,500 for property damage.[1] From the judgment entered, Ford Motor Company brings this appeal. For reversal, it is simply urged that the evidence was insufficient to sustain the verdict against Ford and that the trial court should have directed a verdict in appellant's favor.

Mrs. Gornatti testified that after purchasing the automobile, it was regularly serviced at Everett Motor Company, and her husband offered several work orders, one dated January 25, 1967, one dated July 1, 1967, and one dated November 1, 1967. These were the regular checkups made after attaining certain mileage. According to appellee, the first trouble with the car occurred on November 24, 1967, when Mrs. Gornatti testified that in backing out of her garage it was not necessary to place her foot on the accelerator, and she said that she went to town without putting her foot on the accelerator. That was the only difficulty on that day and the next morning when she went to work, the car operated properly; at noon however, when she came home and started into her driveway, placing her foot on the brake, "I nearly went through my house. Smoke came out of it. I told Lewis about it, and

[1]Since the evidence would not support an award in excess of $2,000 for property damage, appellee agreed that there might be a remittitur of $500.

he said that we just couldn't drive it the rest of the week, because everything was closed. He was just going to take it to work. We didn't drive it any more that week until Everett Motor Company picked it up." She said that the car kept "wanting to go" even after she had turned the key off and that it filled with smoke. The automobile was taken to Everett Motor Company, apparently repaired, and she resumed driving it. She stated that on the morning of December 4, 1967, she drove it to town:

> "As I got up here on Main and Fourth Streets, I had to stop at the red light. When I stopped, my car vibrated to the extent that it just shook. I thought, 'Well, it is going to die.' But it didn't. Well, when the light turned green, I pulled through the light, and, when I saw a car coming out, I stopped."

She said that the car was pulling out from in front of Ross' Drug Store and she eased into the parking place:

> "As you go down in there, you have to put your foot on the brake because there is an incline. I was just fixing to turn my keys off when I was parked, when I heard this awful racket. I don't know what it was. That was the first time I had heard it. It sounded like something hit my radiator. *** Something was hitting my radiator, and then the noise came when I went into Ross' Drug Store. *** Well, sir, I went into that drug store like an airplane with my foot on the brakes."

Mrs. Gornatti was injured, along with two other people and, as previously stated, one person was killed.

Harmon Stillman testified that he was behind Mrs. Gornatti when she parked, and that "something" happened, the car speeding up and going into the drugstore. He said her brake lights flashed as she was parking, and when she "hit the curb, well, this is when this happened". The witness stated that the car jumped the curb; he knew that the brake lights were on while she was in the act of parking, but he could not say they were on at the time she hit the curb.

J. T. Matthews testified that he was walking along

the street when he heard the engine "rev up", heard the crash, people screaming, and he ran to the drug store. Mr. Matthews got into the Mercury and started the car to move it out, stating that it took about three "key turns" before he was able to get it started. He said that as far as he could tell the car seemed to be acting "normal" other than he tried to start it the three times before being successful. The car was first taken to a garage and then on to Everett Motor Company. Mr. Gornatti testified by deposition and stated that at the time of the accident, the mileage on the car was 11,641 miles. He said that he was present at the motor company when the · hood was raised and that the carburetor was removed by Raymond Phillips, the shop foreman for Everett. The witness stated that he noticed that the spring that goes on the carburetor was bent. The spring has two prongs with a hook on each prong and Gornatti said that one end of the hook connected to a part of the carburetor but the other hook was not connected there but was rather connected in the bend of the spring.

Raymond Phillips, service manager for Everett Motor Company at the time of the accident, testified that he had been with that company for 25 years; that the first complaint made by the Gornattis about the Mercury automobile was on November 22, 1967, when they called and advised him that they were afraid to drive the car; that it was idling too fast, and they wanted him· to pick it up. The witness testified that he went to the home, started the car, brought it to the shop, stopped a time or two on the way to see if he could determine anything wrong, but found nothing. At the shop, he assigned it to a mechanic, L. E. Huffman, telling him that the car was idling too fast; after repair work, he drove it again. Phillips said that he stopped and started the automobile five different times after leaving the shop as a matter of trying to determine if something was wrong with it, but found nothing. The dashpot and diaphragm were replaced.[2] The witness said that the spring keeps

[2]Phillips stated: 'Well, that dashpot has a diaphragm inside it, and it keeps your automobile coming from real fast down to real slow". He said that the diaphragm had ruptured and described that part as "what .makes the plunger come back real fast once it is ruptured". Phillips said that the dashpot cannot cause the accelerator to stick and that its only purpose, after driving fast to a stop sign, or intersection, and stopping quickly, is to permit the engine to idle down slowly and keep it from dying.

tension on the accelerator, the longer the spring, the less tension and to the contrary the shorter the spring the more tension. Phillips testified that if the spring was off, the automobile would, "run away with itself" but that had such been the case, when Matthews started the car, "it would have revved up immediately". He said he found nothing wrong with the carburetor that could have caused the occurrence in question. L. E. Huffman, who repaired the car testified that he replaced the dashpot on the carburetor and he explained the action of that part by stating:

"The only thing that it does is slow down gradually when you come up to a stop, so that it won't let the motor stop. It lets it ease down. Once you get down to a certain speed, it just cushions your accelerator."

The witness said the dashpot had no effect on causing the car to go faster; to the contrary, it only made it "slow down".

Huffman said that to make the car go faster, one had to open the carburetor with his hand or depress the accelerator; in other words, the car had to be given more gas. As to the spring, he was of the opinion that if the engine of the automobile was started, and it idled properly, and the car was driven backward, it would certainly indicate that the spring was still hooked; otherwise the accelerator would have been wide open. He said that he "checked" the car on the machine before it was turned over to Phillips to drive, and found nothing wrong with the carburetor; that the spring was not off of the throttle and that he certainly would have noticed it, had that been true.

Robert Riding, Quality Control Engineer for Ford Motor Company, testified that the carburetor and attached parts were received and then installed on a 1966 Mercury; that the idle was checked with the shift in neutral, and the car then driven. The witness said that in testing, they started from zero, went through the gear shifts, and then kicked the carburetor wide open; this was done several times and the carburetor functioned normally. Mr. Riding testified that the dashpot is an assist to prevent the engine from stalling; that neither a defective diaphragm or any-

thing else connected with the dashpot would cause the engine to race; that it has nothing at all to do with acceleration, and that the worst that could happen with a defective dashpot would be for the engine to stall. As to the spring, the witness testified that he found that the spring had been bent and that this was the only modification on the spring; that the major effect would simply be that the driver would have a harder time depressing the accelerator, and that if the spring were hooked on the bend rather than at the end of the hook, it would not result in the carburetor changing from an idle to a rev-up. He said that if the spring were unhooked, the accelerator pedal would go to the floor with no resistance, and would stay on the floor until it was picked up.

The parts were also examined by a Professor Eubanks at the request of representatives of appellee, but Mrs. Gornatti said that she learned that Professor Eubanks could find nothing wrong with the carburetor.

We agree with appellant that the evidence was insufficient to sustain a verdict against Ford Motor Company and the court should have directed a verdict in its favor. Whatever the theory of liability might be based upon (and the suit was filed upon express and implied warranty[3]), it is certain that to prevail, appellee must establish two facts. The first of these is that at the time the automobile left the control of Ford in 1966, it was in a defective condition, and next, that such defective condition was a proximate cause of the damages complained of. It would appear that appellee is relying upon something akin to the tort doctrine of *res ipsa loquitur*, but it will be remembered, that even under that doctrine, it is vital to show that the instrumentality complained of was under the exclusive control of the defendant. *Fibber's Paint and Body Shop* v. *Reed*, 252 Ark. 1016, 482 S. W. 2d 832. Probably the greatest weakness in appellee's case is the failure to establish that the Mercury automobile was in a defective condition when it was sent from the Ford Motor Company to Everett Motor Company in For-

[3]Ford Motor Company expressly warranted each part of the vehicle to be free under normal use and service from defects in material and workmanship for a period of 24 months from the date of delivery or until it had been driven for 24,-000 miles, whichever came first. There were certain exceptions to this warranty but those exceptions were not here involved.

dyce. In *Higgins* v. *General Motors Corporation,* 250 Ark. 551, 465 S.W. 2d 898, the front brake hose on a Pontiac ruptured after the car had been driven some 16,-000 miles and the braking system was rendered ineffective. Higgins sought recovery on the theory of strict liability, but in denying relief this court commented that even if Arkansas should adopt a theory of strict liability in tort, it would still be necessary to establish a pre-existing defect. In *Ford Motor Company* v. *Fish,* 232 Ark. 270, 335 S.W. 2d 713, Fish contended that while he was driving a Ford pickup truck, which had only been driven for 550 miles, that the right front wheel "grabbed" and "locked" causing the truck to overturn wherein Fish was injured, but we said that the burden was on the plaintiff to prove that there was a material deficiency of workmanship, further stating that *res ipsa loquitur* did not apply, and it was mentioned that the alleged defective mechanism was not destroyed but was available to the injured party for inspection and examination. In *Kapp* v. *Sullivan Chevrolet Co.,* 234 Ark. 395, 353 S.W. 2d 5, Mrs. Kapp was injured when her seatbelt broke at the time of an automobile collision and the Kapps contended that the break occurred because of a defect in the workmanship of the belt. We upheld the trial court in directing a verdict for the manufacturer, commenting that plaintiff's proof lacked an essential element, *viz,* the belt was not under the exclusive control of defendants. A number of other cases are cited in *Kapp* that judgments cannot be permitted on the basis of surmise or speculation and appellant cites numerous cases from other states, but, under our own decisions, it is manifest that this judgment cannot stand; however, because of its similarity to the present case, we think one case from another jurisdiction is particularly pertinent. In *Meli* v. *General Motors Corporation,* (Mich.) 195 N.W. 2d 85, an action was brought against the manufacturer based on an alleged breach of implied warranty in connection with an accident which apparently occurred when the accelerator of the automobile stuck to the floor. The trial court directed a verdict for the company and the Court of Appeals of Michigan (Division 1) affirmed, stating:

> "The trial court must, when deciding whether to grant a directed verdict, view the evidence in the

light most favorable to the party opposing it. Therefore, in the instant case, if plaintiffs introduced evidence which tended to prove, either directly or by way of permissible inference, that there was a defect in the accelerator spring when it left the manufacturer and that the defect was the proximate cause of plaintiffs' damages, then there is sufficient evidence to go to the jury.

Expert testimony established only that the spring was probably disconnected at the time of the incident. There was no evidence as to how the spring became disconnected. Therefore, a finding that the spring became disconnected because of a defect in the manufacture would have to rest on mere conjecture rather than on a required reasonable inference.***

In the instant case there was no evidence from which the trier of fact could properly deduce that the accelerator spring became disconnected as a result of a defect in the manufacture. We are dealing here with a part which is open and could have been disconnected while the car was being serviced or through any number of other ways, each as plausible as plaintiffs' contention that it was caused by a defect in the manufacture. *** The engine had been serviced several times. It is, therefore, just as likely that the spring was disconnected independently as it is that it was disconnected through some defect in the manufacture. Therefore, since there was no evidence to remove the plaintiffs' theory from the realm of conjecture, the trial court properly directed the verdict in defendant's favor.''

Unlike the evidence in most cases of the nature now before us, *not a single witness* testified that this automobile had a defective carburetor when it arrived from Ford Motor Company; likewise, *not a single witness* testified that a defective carburetor caused the engine of this car to "rev up" and the automobile consequently to plunge into the drug store. Contrariwise, *all* expert testimony was to the effect that the defect of the bent spring, the dashpot and diaphragm, could not have caused the accident; that in fact, such defect would have slowed the

motor down instead of speeding it up. Of course, complaint had been made to Everett Motor Company a week before the occurrence (that gives rise to this litigation), and employees of that company had inspected the automobile, and in fact replaced the dashpot and diaphragm. It would appear that any defect in the spring could have been observed at that time. It will also be remembered that the car had been in the Everett Motor Company several times before that for periodic inspection under the warranty. As in *Meli*, there is no evidence from which the trier of fact could properly deduce that the accelerator spring became disconnected as a result of a defect in the manufacture. It is pointed out in *Meli* that the engine had been serviced several times, and it was just as likely that it was disconnected independently as it was that it was disconnected through some defect in the manufacture. In other words, the evidence did not remove appellee's theory from the realm of conjecture. The language in *Meli* is likewise *apropos* in the case before us.

Reversed and dismissed.