**FORD MOTOR CREDIT COMPANY**

v.

Hayden HARPER, Jr., Appellee,

v.

**TRI-COUNTY FORD TRACTOR SALES, INC., and Ford Motor Company, Appellants.**

No. 81–1148.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 18, 1981.

Decided Feb. 26, 1982.

Rehearing Denied July 7, 1982.

W. R. Nixon, Jr., Little Rock, Ark., for appellants.

Gibbs Ferguson, McGehee, Ark., for appellee.

Before STEPHENSON and McMILLIAN, Circuit Judges, and HANSON,* Senior

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

District Judge.

HANSON, Senior District Judge.

Third party defendants Tri-County Ford Tractor Sales, Inc. (Tri-County) and Ford Motor Company (Ford Motor) appeal from the district court's judgment in favor of defendant and third party plaintiff Hayden Harper, Jr., cancelling a retail installment contract for a Ford tractor and a 32' hydraulic disc and refunding to Harper his down payment of $31,555. Appellants raise various questions about the district court's application of provisions of Article 2 of the Uniform Commercial Code (the Code) regarding buyer's remedies. We affirm the judgment, but not the reasoning, of the lower court.

I.

Harper farms rice and soybeans on 1200 acres of buckshot soil in Desha County, Arkansas. Buckshot is a heavy soil that becomes sticky when wet, miring down tractors and farm implements. In early 1978, Harper decided to trade in some of his farm equipment for a new four-wheel drive tractor to help him cope with farming his land during wet weather. He anticipated that he would be able to perform his spring tillage work earlier, faster, and easier because of the greater traction a four-wheel drive tractor would provide. In addition, he anticipated the tractor's pulling power would be useful during harvest if it were wet and his combine bogged down in the fields. He could use the tractor to pull out the combine and also to help cart his harvested grain out of the fields.

Eventually he narrowed his choice to either a Ford or a Canadian-built Versatile. The Ford won out mainly because its sales and service center—Tri-County—was only two miles away from Harper's farm whereas the Versatile dealer was located 25 miles away. Harper "thought at the time they [Ford] could give me quicker service than Versatile promised." T. 19. He relied on representations by Doug Snow, Tri-County's president and general manager, that Harper could call for service day or night

and "if they could not fix the tractor within any reasonable length of time ... I could get a loner [sic] until my tractor was fixed ...." T. 21. On March 28, 1978, Harper entered into a retail installment contract with Tri-County to purchase a 335 hp. Ford FW60 four-wheel drive tractor with dual rear wheels (for even greater traction) along with a 32' hydraulic disc. The contract price was $68,500. Harper was credited $31,555 for equipment that he traded in[1] and the balance was financed by Ford Motor Credit Co. (Ford Credit).

Harper used his new tractor during the spring of 1978 to disc, harrow, and generally prepare his land for planting. For the actual planting, Harper used his two smaller two-wheel drive tractors. The FW60 performed satisfactorily during this period (approximately two and a half months) and Harper had his crop in by mid-June. Except for a few days of earth-moving in August, Harper did not use the tractor again until late September or early October when he began discing his fields after harvest. While he was discing, the tractor engine shut down. Harper contacted Snow at Tri-County and he corrected the problem—apparently caused by a leaky oil sealing unit. The tractor continued to function until the last weekend in October when the engine died repeatedly while Harper was attempting to disc a field in preparation for planting a crop of winter wheat. Harper again contacted Tri-County and a mechanic, James Singleton, was sent out. Singleton was unable to determine the source of the problem so Harper took the tractor to Tri-County the following week. He hoped that it could be repaired quickly because he intended to do more discing prior to planting the rest of his wheat crop, but the tractor remained at Tri-County for the entire winter.

Tri-County's repair attempts over the winter were infrequent and unsuccessful. Snow admitted that the tractor "sat on the yard quite a bit" that winter. Sometime after the first of the year, Tri-County's mechanics isolated the problem to the trac-

---

1. Harper traded in a 5020 John Deere tractor, a 1950 Oliver four-wheel drive tractor, a 9600 Ford tractor, a 410 Massey-Ferguson combine, and two discs.

tor's power take-off system (PTO), but they were unable to determine the precise defect that was causing the tractor's engine to die. The PTO system consists of a hydraulically-driven shaft that supplies rotating power to certain farm implements such as augers and pumps. Part of the problem appears to have been that none of Tri-County's mechanics was familiar with this particular tractor model as it was one of Ford's first four-wheel drive tractors. Another related problem was the difficulty encountered in obtaining parts for the tractor.

The mechanics did eventually find and correct various problems with the PTO's electrical system. Tri-County's parts manager, Jack Thiele, testified, "We just about changed the whole PTO system out as far as electrical components." T. 182. There was a malfunction in the electrical module display box; the junction board connecting wires from the front and rear of the tractor was shorted out—the wiring "melted and burned up"—and had to be replaced; in addition there were wires running from the junction board to the rear of the tractor that failed to make connections anywhere. Despite the correction of these problems, the tractor failed to run.

Throughout the winter, Harper checked on the tractor weekly; but as spring approached, he became more impatient, checking on the tractor "almost every other day or every day during the time when I knew I was fixing to have to put a crop in again." T. 40. Finally, in March 1979, Tri-County called in Ford's regional service representative from Memphis, Charles Dory. But Dory had no better luck than the local mechanics in attempting to find and correct the problem with the PTO system. By this time, Harper was ready to begin his spring tilling. He had purchased a long-season variety of rice that had to be planted by May 20 and he needed the four-wheel drive tractor to get into his fields because of unusually wet weather that spring. Ultimately, Dory simply bypassed the PTO system which permitted Harper to use the tractor because none of his tillage implements required the use of the PTO system in order to operate.

Harper used the tractor in April and May to prepare 273 acres for planting the long-season rice. It rained intermittently throughout this period and during the rains, Harper would return the tractor to Tri-County for further attempts—all unsuccessful—to repair the PTO system. Harper managed to get the 273 acres of rice planted by May 20. Thereafter he disced another 100 acres with the tractor before he detected a noise: "It sounded like it was coming from the transfer case or the transmission, and at the time it didn't seem to be hurt, but if I kept driving it something was fixing to tear up. And so, I carried it to Tri-County Ford again to get it fixed." T. 44.

The transmission problem was as vexing to the Tri-County mechanics as the still-unsolved PTO defect. They tore apart and reassembled the transmission to no avail. They again called upon Dory to address the PTO problem and again his repair attempt was unsuccessful. In the meantime, Harper was without the tractor for the remainder of the planting season. He was forced to till and plant the remaining 927 acres of his buckshot land with his two two-wheel drive tractors. He did manage to get his crop in, albeit not until July and only because he ran his tractors 24 hours a day when it was dry enough to get them into the fields. Harper pressed Snow for a four-wheel drive loaner, but the only tractor Snow was willing to offer him was another two-wheel drive, which Harper took, but found "useless" because of the extremely wet conditions. T. 136. Compounding Harper's frustration was that three times during the spring and summer Tri-County called and told him the tractor was fixed. Each time he attempted to drive the tractor back to his farm, only to have the engine die. By August the tractor was still not repaired and Harper was concerned that he would be without a four-wheel drive tractor for harvest. It was shaping up to be a wet autumn and a four-wheel drive tractor would be needed to haul grain out of the muddy fields and to pull out the combine when it inevitably became mired.

On August 10, Harper was notified by Ford Credit that the FW60, which was still

in Tri-County's possession, was being repossessed because he had failed to pay his initial installment. Harper had withheld the payment, due on March 28, 1979, because of Tri-County's inability to repair the tractor. He had written a letter to Ford Tractor and Equipment Operations in Memphis on April 13,[2] indicating that he would make the payment once the tractor was fixed. In response to the repossession notice, Harper, through his attorney, wrote a letter to Ford Credit on August 17, 1979, in which he requested that the tractor be repaired or replaced or else he would revoke his acceptance and demand a refund of his down payment.[3] Upon receiving no response to this letter, Harper revoked his acceptance of the tractor in a letter of September 4, 1979, from his lawyer to Ford Credit (with a copy sent to Tri-County). On October 10, 1979, Tri-County wrote Harper informing him that his tractor had been repaired, but by this time, Harper had purchased a Versatile four-wheel drive tractor and was in the middle of harvest.

This action was begun on November 7, 1979, by Ford Credit to replevy the hydraulic disc that Harper still had in his possession. This claim, however, quickly became moot upon Harper's return of the implement and the focus of the bench trial was upon Harper's third party claims against Tri-County and Ford Motor alleging breach of implied warranties and revocation of acceptance. Harper sought cancellation of the contract, return of his down payment, and consequential damages for crop losses and the extra labor he was forced to hire in lieu of the use of his tractor. The district court found that the tractor had defects in materials, workmanship, and design, that it "was not fit for the use for which it was sold," and that none of the tractor's problems was caused by any misuse or abuse on the part of Harper. The court also found that the contract's warranty disclaimer was inconspicuous and thus inoperative. Ark. Stat.Ann. §§ 85–1–201(10), 2–316. The court concluded that there had been a material breach of implied warranties of fitness for a particular purpose, suitability, and merchantability by Tri-County and Ford Motor. The sales contract was declared cancelled and judgment was entered for Harper for the full amount of his down payment, $31,555. Although the court found that Harper "arguably suffered consequential damages," it concluded that he failed to carry his burden of proof as to the extent of such damages. Likewise, the court concluded that Tri-County and Ford Motor were not entitled to a setoff for Harper's beneficial use of the tractor because they had failed to carry their burden of proving both the extent and value of such use.

## II.

At the outset we shall attempt to separate two distinct strands of buyer's remedies under the Code—revocation of acceptance and recovery of damages for breach of warranty—that have been erroneously intertwined by the district court. Under the Code, once goods are accepted buyer is entitled to cancel the contract and recover so much as has been paid only upon establishing that he has justifiably revoked his acceptance. Ark.Stat.Ann. § 85–2–711.[4] The Code also provides that buyer may recover damages in a suit for breach of warranty in regard to accepted goods. Ark. Stat.Ann. § 85–2–714.[5] The two options

---

**2.** The letter was copied to Ford Credit.

**3.** The letter states in pertinent part:

Mr. Harper expects Ford Motor Company to do one of the following:
1. Repair the machine to the extent that it is fit for the purpose intended. The length of the attempts to repair the machine thus far leave Mr. Harper to believe that this is impossible.
2. Replace the machine with a tractor of equal quality, whether it be a Ford or some other brand. If the replacement is a Ford it must be serviceable at a convenient location

more efficient than the one which Mr. Harper has used.
3. Take the machine back and refund to Mr. Harper all monies paid by him or equipment traded in by him on the machine.
Defendant's Exhibit 3.

**4.** § 85–2–711 provides in pertinent part:
(1) Where ... the buyer justifiably revokes acceptance then with respect to any goods involved, ... the buyer may cancel and whether or not he has done so may [recover] so much of the price as has been paid ....

**5.** § 85–2–714. Buyer's damages for breach in

are nonalternative in character and buyer may pursue either remedy or both. Ark. Stat.Ann. § 85–2–608, Comment 1. They are, however, separate remedies treated in entirely different sections of the Code and they offer separate forms of relief. Accordingly, it does not follow from the district court's legal conclusion of breach of warranty that Harper was entitled to cancellation of the contract and recovery of his down payment. *See Solar Kinetics v. Joseph Ryerson & Son*, 488 F.Supp. 1237, 1242 (D.Conn.1980); *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.*, 428 F.Supp. 364, 377 (E.D.Mich.1977); *cf. Frontier Mobile Home Sales, Inc. v. Trigleth*, 256 Ark. 101, 505 S.W.2d 516, 518 (1974) (rejects notion that proper measure of recovery for revocation of acceptance is stated in § 85–2–714 which states measure of damages for breach of warranty). The district court's *non sequitur*, however, is not fatal. We hold that the court's basic findings, together with the supporting evidence in the record, provide us with a sufficient factual basis to determine as a matter of law that Harper's revocation of acceptance was justifiable, thus entitling him to the relief prescribed by the lower court. *See Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 354 (Minn.1977).

Revocation of acceptance under Ark. Stat.Ann. § 85–2–608 [6] is justifiable when buyer establishes (1) a nonconformity which substantially impairs the value of the goods to the buyer; (2) acceptance (a) with discovery of the defect on the reasonable assumption that the nonconformity would be cured or (b) without discovery reasonably induced by the difficulty of the discovery or by seller's assurances; (3) revocation within a reasonable time after the nonconformity was discovered or should have been discovered; and (4) revocation before a substantial change occurs in the condition of the goods not caused by their own defects. White & Summers, *Uniform Commercial Code* § 8–3 at 303 (2d ed. 1980) (hereinafter cited as White & Summers).

The concept of nonconformity "includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract." Ark.Stat.Ann. § 85–2–714, Comment 2. It is thus apparent that breach of warranty and nonconformity are not entirely congruent concepts; the former being a subset of the latter. Accordingly, we could at this point rest on the lower court's conclusion that appellants breached implied warranties and hold that this satisfies the element of nonconformity. But appellants argue that under Arkansas law, Harper failed to establish breach of warranty [7] be-

regard to accepted goods.—(1) Where the buyer has accepted goods and given notification . . . he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

**6.** § 85–2–608. Revocation of acceptance in whole or in part.—(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

**7.** We reject appellants' preliminary contention that express and implied warranties were effectively disclaimed in the contract. The district court's ruling from the bench (later reiterated in the memorandum opinion) was not erroneous and reflects our sentiments upon reviewing the disclaimer provision:

I have concluded without any doubt that the disclaimer on the back of this agreement, which was signed by the parties, is not conspicuous enough and I think that the dis-

cause only manufacturing defects are capable of supporting a breach of warranty claim and the evidence in this case was insufficient to link the origin of the tractor's defects to the manufacturer. *See, e.g., Ford Motor Co. v. Gornatti,* 253 Ark. 237, 486 S.W.2d 10 (Ark.1972). Before responding, we review the evidence cited by appellants in support of their claim.

At trial, appellants proffered testimony by the Ford regional service representative, Dory, and another service representative from Steiger Tractor Co.,[8] Tom Eables, who also worked on the tractor. They testified that they repaired the tractor during the last three days of August 1979 (although the record reflects that the tractor was never field-tested and that Harper was not formally notified of the repair until October 10, 1979). Both men indicated that the PTO malfunction and the transmission problem were not attributable to manufacturing defects. Apparently, the PTO malfunction was caused by a bent electrohydraulic cartridge (EHC), described as a pencil-sized part located under the hood in front of the tractor's radiator. Both Dory and Eables opined that this could not have been a factory defect and must have been bent by someone inadvertently stepping or dropping something on it while working on the tractor. But the only people who worked on this tractor were agents of appellants. Thus while it may be said that this particular defect did not originate at the factory, it cannot be said that appellants are not responsible for it. We also find it significant that appellants made no attempt at trial to disavow that the PTO's

extensive electrical malfunctions were anything but factory defects.

As for the noise in the transmission, Eables testified that the source of the problem was an improperly adjusted clutch; the clearance between the throw-out bearing and the transmission brake was improperly set. Eables said such a condition is "usually" caused by lack of lubrication or improper lubrication of the throw-out bearing, but he would not and, indeed, could not state with certainty that lack of lubrication was the cause of the problem because he admitted that he did not remove the throw-out bearing when he worked on the tractor. On the other hand, Harper testified that he always lubricated the tractor in accordance with the instructions in the owner's manual. In addition, the uncontradicted evidence shows that shortly after Harper took possession of the tractor in the spring of 1978, he brought it back to Tri-County for a clutch adjustment because he found the tractor difficult to shift. In light of the lower court's general finding (which we hold is not clearly erroneous) that none of the tractor's problems was caused by "the negligence, abuse, misuse or failure of Harper to comply with his obligations under the express limited warranty," we may assume the court determined that it was more probable than not that the problem with the clutch was the fault of Tri-County and not Harper. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2579 at 712–13 (1971) ("In some cases if [the trial court] fails to make a finding on a particular fact it has been assumed that ... [the court] impliedly made a finding consistent with [its] general finding."), *quoted with approv-*

claimer of warranty, express or implied, on the back of the sales agreement is ineffective. Section 85-2-316 of Arkansas Statutes states that any written disclaimer of the implied warranties must be conspicuous. And conspicuous is defined as being written so that a reasonable person against whom it is to operate ought to have notice of it. And I don't believe I ever have, even on insurance contracts, seen so much written on the back of one page in such small type. It's so small that, though I can read my notes and I can read law books without my glasses most of the time, even when I put my glasses on this is difficult to read.

And it is not set out by brackets. It is not set out by unusually large print. It is in just a slightly bolder print, and certainly that is not conspicuous in the eyes of the Court, nor do I think it would be conspicuous under the guidelines set out by the Arkansas Supreme Court. And, for that reason, I am ruling at this time that the disclaimer is ineffective. T. 333. *Cf. DeLamar Motor Co. v. White,* 249 Ark. 708, 460 S.W.2d 802 (1970) (not conspicuous when only slight contrast with balance of instrument).

8. Steiger Tractor Co. manufactures the FW60s for Ford.

*al in Swanson & Youngdale v. Seagrave Corp.,* 561 F.2d 171, 173 n.5 (8th Cir. 1977). In sum, the blame for the tractor's various malfunctions lies squarely on both the manufacturer, Ford Motor, and the inexpert repair and maintenance of Tri-County.[9]

■ According to appellants, such a conclusion supports their argument that breach of warranty has not been demonstrated in this case because of Harper's inability to link the tractor's defects *in toto* to the manufacturer. We need not decide whether this is so because our focus is not upon breach of warranty, but on the broader concept of nonconformity. We repeat that nonconformity "includes not only breaches of warranty, but also any failure of the seller to perform according to his obligations under the contract." Harper's express understanding with Tri-County was that he could expect efficient and competent service for the tractor. Indeed the proximity of the dealership from his farm and the assurances of Snow regarding service were the ultimate factors in Harper's decision to purchase the Ford. Tri-County failed to perform in accordance with its obligations to Harper because of its dilatory and incompetent repair attempts. Therefore, the combination of factory and service-related defects supports the conclusion that there was a nonconformity under the contract. *Cf. Frontier Mobile Home Sales, Inc. v. Trigleth, supra* (nonconformity held to exist where defects were entirely the fault of seller).

■ The nonconformity is insufficient to warrant buyer's revocation of acceptance unless it substantially impairs the value of the goods to buyer. Substantial impairment is amply borne out in the record in this case. Simply put, Harper bought the tractor for use at certain times of the year and to cope with certain soil and weather conditions; but he was deprived of the use of the tractor during those critical periods. Having traded away a good deal of his farm equipment in order to buy the tractor, Harper found himself at an enormous handicap in his farming operation. The test for substantial impairment is said to be, at bottom, a common sense perception, White & Summers § 8–3 at 306, and such a perception in this case leads to no conclusion but that the tractor's nonconformity substantially impaired its value to Harper.

■ Next, Harper was required to show that he accepted the tractor either with knowledge of the nonconformity and assurances of cure by seller or with no knowledge of the nonconformity because of latent defects or because of seller's assurances. That Harper accepted the tractor is uncontested as is the latent nature of the defects that prevented their discovery at the time of acceptance by Harper.

■ Appellants do contest the third requirement for a justifiable revocation—whether Harper's revocation was within a reasonable time after the nonconformity was discovered or should have been discovered. The Code recognizes that

> [s]ince this remedy will be generally resorted to only after attempts at adjustment have failed, the reasonable time period should extend in most cases beyond the time in which notification of breach must be given, beyond the time for discovery of non-conformity after acceptance and beyond the time for rejection after tender.

Ark.Stat.Ann. § 85–2–608, Comment 4. The time between Harper's acceptance of the tractor and the revocation was approximately 17 months. Under the circumstances of this case, this was a reasonable time. Arkansas cases on this point recognize that a consumer should not be penalized for continued patience with a seller who promises or repeatedly attempts to make good a nonconforming delivery. *Frontier Mobile Home Sales, Inc. v. Trigleth, supra* (nine months not unreasonable re mobile home); *Dopieralla v. Arkansas Louisiana Gas Co.,* 255 Ark. 150, 499 S.W.2d 610 (1973) (40 months not unreasonable re heating and cooling system); *Gramling v. Baltz,* 253 Ark. 352, 485 S.W.2d 183 (1972) (two years

---

**9.** We note that in their attempt to shift the blame for the defects entirely away from the manufacturer, appellants readily admit that there were service-related defects in the tractor. *See* Brief of Appellants at 9.

not unreasonable re truck). Appellants further argue that it was unreasonable for Harper to revoke his acceptance in September after the tractor had purportedly been repaired in late August. We have already noted that Harper was not informed that the tractor was repaired until October. Even if he were aware that it had been fixed, this fact alone would not preclude a valid revocation. Seller does not have an unlimited time within which to cure the nonconformity; it must be cured "seasonably," Ark.Stat.Ann. § 85–2–608(1)(a), which the Code defines as "within a reasonable time." Ark.Stat.Ann. § 85–1–204(3). "That period may well have passed in circumstances where the seller has been given several opportunities to cure." *Durfee v. Rod Baxter Imports, Inc., supra,* 262 N.W.2d at 355.

■ It remains to be determined whether substantial change occurred in the condition of the tractor through Harper's use aside from its own defects. The tractor's hourmeter, the equivalent of an automobile's odometer, indicated 733 hours of use as of August 10, 1979, the date of Ford Credit's notice of repossession. Arguably appellants were entitled to an offset against Harper's recovery of the full amount of the down payment upon establishing some credible basis for calculating the value of Harper's beneficial use of the tractor. The district court found that there was no credible basis offered for such a calculation because appellants failed to show the tractor's fair rental value and because there was no indication how many of the 733 recorded hours were put on the tractor by Harper and how many were put

on by Tri-County "during the numerous and protracted repair attempts." Memo. op. at 2.

■ Appellants offered the testimony of Dr. Charles Walden, an agricultural economist, who stated that Harper would have been able to cover his entire 1200-acre farm ten times in 733 hours. Clearly Harper's beneficial use of the tractor was not nearly this great. The record reflects that Harper actually used the tractor for five months at the most. Dr. Walden's testimony merely bears out Harper's contention that a sizeable portion of the 733 hours was put on the tractor by Tri-County. In addition, Snow's testimony as to the rental value of the tractor resulted in calculations grossly disproportional to any fair assessment of Harper's beneficial use. On an hourly basis, Snow claims he would have assessed Harper over $36,000 for 733 hours of use; on a monthly basis, the rental value according to Snow would have been $50,000. Neither figure is reasonable when compared to the tractor's $57,000 purchase price. Clearly it was appellants' burden to establish some reasonable basis for determining a setoff [10] and we hold that the district court did not err in concluding that this burden was not met.

## III.

■ The two final points raised by appellants concern whether Harper should have been permitted to revoke acceptance of the disc in light of its lack of nonconformity, and whether the manufacturer, Ford Motor, should have been held jointly and severally liable for return of the down payment along with the seller, Tri-County.

---

**10.** White & Summers explains the nature of this burden as follows:

[In the typical revocation of acceptance case] the goods are defective; they fail in some way to perform the function for which the buyer purchased them and if they confer a benefit at all it is a lesser benefit than the buyer expected to receive. Moreover, the buyer can argue that he received not only a smaller benefit than he expected, but he also suffered the psychic cost associated with the uncertainty about whether the goods would work and the aggravation associated with unsuccessful attempts to cure. In a typical contract suit we would not allow the buyer to

recover for such psychic injuries but it is not clear that they should not be worked into the valuation scheme in this kind of case. In any event the principle is the same, namely that the buyer should pay for the benefit conferred; the difficulty arises only in valuing that benefit. Presumably, if the breaching party (the seller) is the "bad guy" the court should not be generous to him but should leave to him the burden of coming forward with credible evidence to show that he is entitled to an offset by proving the value of the benefit conferred on the buyer.
§ 8–3 at 318.

Regarding the first point appellants claim that since Harper's revocation of acceptance made no mention of the disc and since it was not nonconforming, he should not be permitted to recover that portion of the down payment, calculated to be 17%, which was attributable to the disc. The argument is unavailing. Harper bought the 32' disc only because his new tractor provided sufficient horsepower to pull it. Accordingly, cancellation of the contract on account of the tractor's nonconformity entitled Harper to recover the entire down payment upon his return of the disc, which he has done.

 As to the second point, appellants claim that only seller may be held liable for return of the purchase price once buyer is held to have justifiably revoked acceptance of nonconforming goods. *See, e.g., Voytovich v. Bangor Punta Operators, Inc.,* 494 F.2d 1208, 1211 (6th Cir. 1974). Although the Code eliminates the defense of privity in suits for damages for breaches of warranties,[11] it is silent as to revocation of acceptance. Adopting appellants' position, however, would effectively deprive Harper of any relief, because it was disclosed at trial that Tri-County is no longer in business. Such a result is contrary to the Code's mandate to administer its remedies liberally. Ark.Stat.Ann. § 85-1-106(1). We therefore uphold the lower court's determination that Ford Motor be held jointly and severally liable with Tri-County for return of Harper's down payment. *See Durfee v. Rod Baxter Imports, Inc., supra,* 262 N.W.2d at 357-58.

Accordingly, for the foregoing reasons, the judgment of the district court is affirmed.

---

**11.** Ark.Stat.Ann. §§ 85-2-318.1, 318.2, 318.3.