# FORD MOTOR CREDIT COMPANY v O'STEEN and JIM ADAMS FORD, INC.

## Case No. 86 CC11 0012

County Court, Polk County, Florida

December 9, 1987

## APPEARANCES OF COUNSEL

**Marvin Solomon** for plaintiff.
**Stephen M. Martin** for defendant.
**George T. Coward** for defendant.

## OPINION OF THE COURT

CAROL C. MURPHY, County Judge.

This case came on to be heard on July 8, 1987 at a trial before the court. Plaintiff, Ford Motor Credit Company, filed a complaint against defendant, George A. O'Steen, for damages for breach of two vehicle leases. Defendant claimed against Jim Adams Ford, Inc., in a third party complaint for any damages for which defendant might be found liable to plaintiff under the theory of breach of warranty or maintenance contract. All parties were represented by counsel. Testimony was taken and exhibits submitted. Two depositions were filed in the court record, but no party moved for admission of the depositions to the evidence at trial and the court has not read these depositions or taken them into account. All parties submitted memoranda and the court has carefully read and considered all matters raised therein.

Numerous issues need to be addressed, including whether the transactions were true leases or secured transactions under article 9; whether defendant waived in regard to Ford Credit any or all defenses which he might have had against Jim Adams Ford; whether the disclaimer of warranties was conspicuous; whether, if there was a warranty, it was breached; and whether Ford Credit was holder in due course status under the lease. Issues raised which do not need to be addressed were the relationship between the lessor, Jim Adams Ford, and the assignee, Ford Motor Credit; whether the transaction was a consumer transaction; whether there was a failure of consideration; and whether the disclaimer of all warranties in such a lease is unconscionable.

### FINDINGS OF FACT

1. O'Steen leased a new 1984 F150 Ford Pickup Truck [the white truck] from Jim Adams Ford, Inc., on March 14, 1984. He leased a second new 1984 F150 Pickup Truck [the red truck] on August 10, 1984.

2. When Jim Adams Ford accepted the lease contracts on the pickup trucks by signing at the appropriate place on the lease contract, it simultaneously assigned the leases to Ford Motor Credit Company. The lease forms were drafted by the legal department of Ford Credit to protect itself.

3. The lease contracts for both transactions are almost the same and have identical wording in all pertinent provisions. They are both quite lengthy on paper longer than legal size, with double columns of provisions closely spaced on the front and the other closely packed provisions on the back of the contract.

4. Both contracts have a provision by which the lessee agrees that "Ford Credit will not have to make any repairs or maintain the Vehicle." Both also have provisions giving notice that there are provisions on the back of the contract. Both contracts have a warranty disclosure/disclaimer provision on the reverse side.

5. The two trucks were plagued with front end problems which caused the front tire to wear out and problems with the brakes. All repair work on the cars was done by Jim Adams Ford. The front tires were replaced on the white truck at lease twice but possibly three times in eleven months and 22,500 miles. Ford Motor Company paid for one of the two tires each time and may have paid for both tires the first time. Ford Motor Company is not a party to this lawsuit. O'Steen did not have all the car repair worksheets and the other defendants did not submit the ones O'Steen was missing. The last time the tires were replaced on the white truck, a larger size was put on, on the advice of a Ford Motor Company representative, to see if that might clear up the problems. The oversized tires caused the vehicle to be very hard to control.

6. The front tires were replaced on the red truck at three months and 11,400 miles and again at seven months and 28,900 miles. Ford Motor Company paid for one of these tires each times.

7. When it was finally apparent to O'Steen that the front end problems and wear on the tires were not going to be remedied, he called Ford Credit and told it he would not be making any more payments because the vehicles were defective. He then returned the trucks to Jim Adams Ford, who turned them over to Ford Credit. At this time, O'Steen was not behind on his lease payments to Ford Credit on the two vehicles. At the time of the voluntary return, the white vehicle was 15.6 months into the 48 month lease and had 27,881 miles on it. The red truck was 11 months into a lease of the same length and had been driven 36,643 miles.

**25**

8. During the time O'Steen had the trucks, he and his friends who drove one of the trucks went into Jim Adams Ford time and time again. Many of the times they were put off by the dealership telling them that it was trying to get in touch with the Jacksonville zone office or the Michigan home office of Ford Motor Company to try to get some guidance on what could be done.

9. O'Steen and his friend who drove one of the trucks were not merchants and were not sophisticated businessmen. They used the trucks to go back and forth to work, which was sometimes a construction site, sometimes in cities as far as 60 miles away. The truck were used to carry tools of up to 200 pounds to and from work but were not actually used on the job.

10. No one introduced evidence of the normal wear and tear on tires. No witness testified that it was normal for the tires to wear out as they did, given the mileage on the trucks.

11. O'Steen notified Jim Adams Ford in a timely manner of the defects in the two pickup trucks. He reasonably allowed Jim Adams Ford every opportunity to cure the defects, bringing the trucks back again and again. The defects were never remedied and were such as to impair the use of the vehicles. He notified Ford Credit when it was apparent the defects could not be remedied. Ford Credit does not claim prejudice because of the the date it was notified of the defects, and at the time it was notified, did not offer to try and work on the trucks or cure the defects or to negotiative or even find out the extent of the impairment of the use of the vehicles because of the defects. *See Eckstein v. Cummins,* 321 N.E.2d 897 (Ohio Ct. App. 1974); Fla. Stat. § 672.607(3) and Official Comment 4 thereto.

The court is satisfied that because Jim Adams Ford and the Jacksonville and Detroit divisions of Ford Motor Company had input into the problems with the trucks, Ford Credit was not prejudiced by not being notified until Ford Motor Company and the dealer failed in their efforts to remedy the effects in the two trucks.

## CONCLUSIONS OF LAW

1. The transactions involved are leases, not secured transactions.

2. The lease contracts are not negotiable promissory notes under article 3 of the Uniform Commercial Code, because they are not payable to order or to bearer and because they are not for a sum certain, as the promise to pay in section 12 of the leases is dependent on external evidence of mileage to determine the amount owed thereunder. *See Lock v. Aetna Acceptance Corp.,* 309 So.2d 43 (Fla. 1st

DCA 1975); 6 Fla.Jur.2d Bills and Notes §§ 79 and 84; Fla. Stat. §§ 673.103(1)(b) & (d), 673.110 and 673.111.

If the leases are not negotiable instruments, Ford Motor Credit cannot be a holder in due course. As assignee of a non-negotiable instrument, Ford Credit is subject to all defenses that Jim Adams Ford, the original lessor, is subject to connected with the lease, except those explicitly waived. *Nusbaum v. Riskin,* 136 So.2d 1 (Fla. 2d DCA 1961).

3. Because the leases are not secured transactions and not negotiable instruments, section 679.206 is not applicable to any waiver. Under the clauses headed "Assignment" directly above the place for the lessor to sign on the left side of the front page of the documents, O'Steen agreed that Ford Credit would not have to "make any repairs or to maintain the Vehicle[s]." Under this provision, O'Steen may have waived some rights against Ford Credit, but did not waive his right to the implied warrant of merchantability, because any waiver of the warranty of merchantability must mention merchantability, among other requirements. Fla. Stat. § 672.316(2). O'Steen further waived against Ford Credit the performance of "any other service that the Lessor has agreed to perform under this lease." This also is not a waiver of the implied warranty of merchantability, as the lessor, Jim Adams Ford, never explicitly agreed to a warranty of merchantability. Any such warranty, if existing, arose under operation of law, not by agreement between O'Steen and Jim Adams Ford. *Frigidinner, Inc. v. Branchtown Gun Club,* 176 Pa. Super. 643, —, 109 A.2d 202, 204 (1954).

4. Under 16 of the lease for the white truck, section 17 for the red truck, both the lessor and the assignee disclaim any warrant of merchantability or fitness for a particular purpose of the vehicles. Warranties of merchantability arise in leases as in sales by operation of law. *W. E. Johnson Equipment Co., Inc. v. United Air Lines, Inc.,* 238 So.2d 98 (Fla. 1970) (by analogy to warranties of fitness for particular purpose). These warranties are not limited to consumer leases as, in the *W.E. Johnson Equipment* case, the lessee was United Air Lines. *See United Air Lines, Inc. v. W. E. Johnson Equipment Co., Inc.,* 227 So.2d 528 (Fla. 4th DCA 1969).

5. This court is not making any findings as to whether the leases here concerned should be considered consumer leases or not, as this would be a close question in this case and such a finding is not necessary to the outcome herein.

6. In some states, courts have ruled that disclaimers of implied warranties are disfavored and must be strictly construed against the

drafter. These courts put the burden of proving compliance with the Uniform Commercial Code requirements for disclaimers upon the proponent of the disclaimer. *See FMC Finance Corp. v. Murphree,* 632 F.2d 413, 419 (5th Cir. 1980) (Illinois), which, at 420, treats a warranty disclaimer as a defense, which must be proved by the proponent thereof. *Also see Seattle Flight Service, Inc. v. City of Auburn,* 24 Wash. Ct. App. 1268, 1270, 604 P.2d 975, 977 (1979); *Dorman v. International Harvester Co.,* 46 Cal. App.3d 11, 120 Cal Rptr. 516 (1975); *Quality Acceptance Corp. v. Million and Albers, Inc.,* 367 F.Sup. 771 (D.C. Wyo. 1974).

7. Under the UCC, "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous." Fla. Stat. § 672.316(2). "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." Fla. Stat. § 671.201(10). Thus, the concept of conspicuousness is "one of reasonable notice—whether the writing would have invited the attention of a reasonable person." *FMC Finance Corp. v. Murphree,* 632 F.2d 413, 418 (5th Cir. 1980); Fla. Stat. § 671.201(10) (Official Comments).

8. The determination of whether a clause is conspicuous or not is one for the court. Fla. Stat. § 671.201(10); *Monsanta Agr. Products Co. v. Edenfield,* 426 So.2d 574, 578 (Fla. 1st DCA 1982) (on motion for rehearing).

9. The disclaimers of the warranty of merchantability found in sections 16 and 17 respectively of the leases for the white and the red trucks are not sufficiently conspicuous and, therefore, are ineffective to exclude this remedy. The concept of conspicuousness under the UCC encompasses all of the circumstances involved in a particular situation. The warranties are on the reverse side of an agreement with many, many, many clauses on both the front and the back. There are two notices on the front of the agreements referring to other agreements on the reverse and the fact that the disclaimers are on the reverse does not make them per se inconspicuous. *Rudy's Glass Const. Co. v. E. J. Johnson Co.,* 404 So.2d 1087, 1089 (Fla. 3d DCA 1981).

10. However, the form of the disclaimer clauses is the same as that of all other clauses on the top half of the reverse of the contracts, except that the second sentence is printed in darker type than the rest of the paragraph. This clause is the first numbered paragraph of ten similar paragraphs on the reverse for the white truck and the second of fourteen paragraphs on the reverse of the contract for the red truck.

28

Other than the fact that one is first and the other is second on the reverse side of the contracts, the clauses are identical in each contract. There are no highlighting, underlining, italicizing, double spacing, indenting from the margin, boxing off, or capitalizing of letters in these clauses. The size and style of type is the same as in the nine other clauses on the back for the white truck and the thirteen other clauses on the back for the red truck. Each of the contracts has empty space on the back where these clauses could have been set out in a very conspicuous way.

11. Other circumstances to be considered are the position, whether early or late in the leases, and the business experience of the lessees. *FMC Finance Corp. v. Murphree,* 632 F.2d 413, 419 (5th Cir. 1980). The disclaimers in the instant case are on the reverse and both O'Steen and his friend are inexperienced and unsophisticated.

The heading of the provisions in which the disclaimers are found is "Warranty." Placing a *disclaimer* under the heading "Warranty" can be misleading and certainly does not help to make a disclaimer of warranty conspicuous. *Monsanta Agr. Products Co. v. Edenfield,* 426 So.2d 574, 577 (Fla. 1st DCA 1982); *Dorman v. International Harvester Co.,* 46 Cal. App.3d 11, 120 Cal. Rptr. 516 (1975).

12. The disclaimer of warranty in *Ford Motor Credit Co. v. Harper,* 671 F.2d 1117 (8th Cir. 1982), appears to be about the same as the ones in the instant case. The *Harper* court stated:

And it is not set out by brackets. It is not set out by unusually large print. It is in just a slightly bolder print, and certainly that is not conspicuous in the eyes of the court.

*Id.* at 1122-23 n.7.

13. An ALR 3d article stated that many cases recognize that "an implied warranty disclosure will not be considered conspicuous for purposes of section 2-316(2) if there is only a 'slight' contrast between it and other provisions of the document." 73 ALR 3d 248, 282 (1976). Other cases have found a disclaimer not sufficiently conspicuous where the only difference between the disclaimer and the other provisions of the contract was slightly bolder print or a slight contrast with the other provisions. *See Rudy's Glass,* 404 So.2d at 1090; *Murphree,* 632 F.2d at 419; *Dorman,* 46 Col. App.3d 11, 120 Cal. Rptr. 516 (1975); *Greenspan v. American Adhesives, Inc.,* 320 F. Supp. 442 (E.D. Pa. 1970); *Office Supply Co. v. Basic/Four Corp.,* 528 F.Supp. 776, 784 (E.D. Wis. 1982).

14. Although the disclaimers in these leases are in somewhat darker

**29**

type, the contrast is slight. The test is whether the attention of the average person leasing a car would be drawn to these provisions because they are conspicuous and contrast with the rest of the provisions on the face (or reverse) of the leases. It is this court's opinion that the disclaimers of warranty do not stand out from the other provisions of the leases and, thus, are ineffective.

15. One Florida court has stated that

Every buyer has the right to assume his new car, with the exception of minor adjustments will be "mechanically and factory furnished, operate perfectly and be free of substantial defects" especially in view of the high powered techniques of the auto industry.

After the purchase of an automobile, the same should be put in good running condition; that is the seller does not have an unlimited time for the performance of the obligation to replace and repair parts. The buyer of an automobile is not bound to permit the seller to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty. At some point in time, if major problems continue to plague the automobile, it must become obvious to all people that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free of defects.

*Orange Motors of Coral Gables, Inc. v. Dade County Dairies, Inc.,* 258 So.2d 319, 320-21 (Fla. 3d DCA 1972), *quoting Zabriskie Chevrolet, Inc. v. Smith,* 99 N.J. Super. 441, 240 A.2d 195 (1968) (Other cites omitted).

[A] purchaser . . . has the right to expect the automobile to perform properly and as represented. If it does not, through no fault of his, . . . he should be allowed to seek redress.

*Rehurek v. Chrysler Credit Corp.,* 262 So.2d 452, 456 (Fla. 2d DCA 1972). *cert. den.,* 267 So.2d 833 (Fla. 1972).

16. There is a difference between a breach of warranty and a revocation of acceptance, both in the elements and type of proof required and the damages. *Ford Motor Credit Corp. v. Harper,* 671 F.2d 1117, 1121-22 (8th Cir. 1982). This difference is muddied somewhat in a lease, because the contract requires return of the product at the end of the relationship. Revocation of acceptance is an equitable remedy, but O'Steen is not seeking affirmative relief. County courts have jurisdiction over equitable defenses. Fla. Stat. § 34.01(1)(c)2. The test for revocation of acceptance is "whether there has been substantial impairment of value to the buyer." *Orange Motors,* 258 So.2d at 321; *also see Harper,* 671 F.2d at 1122-24. This impairment has been

30

proved. O'Steen, who was up-to-date on his payments at the time he returned the trucks to Jim Adams Ford and Ford Credit, should not and will not be required to continue to pay to lease trucks whose defects could not be and were not remedied.

17. The third party complaint is moot.

Based on the foregoing it is hereby

ORDERED AND ADJUDGED that defendant George A. O'Steen is not indebted to plaintiff Ford Motor Credit Company. Ford Motor Credit Company takes nothing by this suit and George A. O'Steen goes hence without day. The third party complaint of George A. O'Steen against Jim Adams Ford, Inc. is moot. Plaintiff Ford Motor Credit Company is liable to defendant George A. O'Steen for $54.00 in costs, for which let execution issue. Interest on this judgment will accrue at 12% per annum.

## CERTIFICATION

Pursuant to rule 9.160 of the Florida Rules of Appellate Procedure, this court certifies the following issue as one of great public importance:

Whether the disclaimers of warranties in the leases in this case which vary from the other provisions in the leases only by being printed in somewhat darker type are conspicuous within the requirements of section 672.316(2) under the guidelines set out in section 671.201(10)?

This issue is of great public importance because many people lease cars in agreements such as the ones used in this case and a large number of these are assigned to Ford Motor Credit Company under identical or similar leases.

DONE AND ORDERED in Chambers at Bartow, Polk County, Florida, this the 9th day of December, 1987.